Filed 1/8/21

# CERTIFIED FOR PARTIAL PUBLICATION†

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ELLIOT KIMO LAANUI,<br><br>　　　Defendant and Appellant. | B297581<br><br>(Los Angeles County<br>Super. Ct. No. YA095719) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge. Affirmed as modified.

　　　Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

---

　　　† Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of parts A, B, C, D, E, G, H, and I of the Discussion.

Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Elliot Kimo Laanui appeals from the judgment after his conviction for six offenses committed between 1995 and 2017, including murder, solicitation of murder, and assault with a firearm.  On appeal, defendant argues (1) the trial court abused its discretion by admitting into evidence an insufficiently redacted photograph of defendant shown to witnesses for purposes of identifying skin tone; (2) the prosecution committed misconduct during closing argument by appealing to the jury's sympathy for the murder victim and his family; (3) the trial court should have granted defendant a new trial in light of the erroneous admission of the photograph and the prosecutorial misconduct; (4) imposition of a restitution fine and court assessments violated defendant's right to due process; (5) defendant's counsel was ineffective to the extent he did not object to errors below; (6) the trial court erroneously doubled the sentence on one count based on an unpleaded prior strike conviction; (7) the trial court imposed a firearm enhancement under the wrong statute; (8) the trial court wrongly denied defendant presentence conduct credits; and (9) the minutes failed to state that the trial court struck five prior prison term enhancements.

In the published portion of this opinion, we address defendant's sixth claim of error, and hold that the information adequately pleaded the prior strike as to all counts, and the trial court did not err in doubling the sentences of all eligible offenses.

2

In the unpublished portion of the opinion, we hold that the trial court did not abuse its discretion by admitting the photograph, nor was the admission unduly prejudicial. The contentions regarding prosecutorial misconduct and the imposition of fines and fees are forfeited, and also fail on the merits. In the absence of prejudicial error, defendant was not entitled to a new trial, nor did he demonstrate ineffective assistance of counsel for purposes of this direct appeal. The Attorney General agrees with defendant, as do we, that the trial court imposed a firearm enhancement under the incorrect statute, that defendant is entitled to conduct credits, and that the minutes do not reflect the trial court's striking of the prior prison term enhancements. We direct the trial court to correct the errors on which the parties agree, but otherwise affirm the judgment.

## FACTUAL BACKGROUND

We limit our summary of the evidence to the facts relevant to the resolution of this appeal, and do not attempt to summarize all evidence presented at trial.

### 1. Prosecution evidence

#### a. Murder and solicitation of murder

##### i. Homicide and initial investigation

On November 11, 1995, Edward Emery (Emery) and his wife Jacqueline Emery went to a supermarket in Redondo Beach. After buying some groceries, they returned to their vehicle in the store parking lot. A man suddenly appeared, grabbed the front of the shopping cart, and began shooting a gun at Emery. Multiple

bullets struck Emery, who fell to the ground. Emery died from his wounds.

Julia Lindman, who was in the parking lot at the time of the shooting, heard gunfire and saw a "dark-skinned male" pointing a gun in her direction and firing it.

Frank Dozier was in a coffee shop near the supermarket parking lot at the time of the shooting. Through the window of the coffee shop, Dozier saw a man shooting another man with a nickel or silver-colored revolver. The shooter then fired at other people in the parking lot. The shooter got into a dark-colored minivan, which drove away.

Annette Silas was loading groceries into her car when she heard gunshots. She did not see the shooter. Silas saw a dark Chevy Astro van, possibly navy blue, exit the parking lot.

Jacqueline Emery described the shooter as having skin tone of "[c]offee with cream, a lot of cream." She testified that after the shooting she was unable to find her husband's money clip. The prosecution suggested robbery as a likely explanation for the shooting.

Police investigating the crime scene found freshly deposited saliva on the window of a vehicle in the parking lot. The police collected samples of the saliva.

In 2011, John Skipper, a retired police captain investigating unsolved crimes for the Redondo Beach Police Department, had the saliva analyzed for DNA evidence.[1] The DNA matched defendant's profile in a nationwide DNA database. After further investigation, Skipper determined that defendant

---

[1] According to Skipper, DNA analysis was not "commonplace" in 1995 when the murder occurred.

4

matched the physical profile of the shooter, his residence at the time was about four miles from the crime scene, and a year before the murder he had been arrested driving a black Chevy Astro van.

Corroborating Skipper's testimony, the prosecution presented evidence that the DNA in the saliva collected at the scene of the murder matched defendant's DNA. The prosecution also presented a police report indicating defendant was driving a black Chevy Astro van on August 17, 1994. A registration record from August 2000 to August 2001 indicated the van was registered to defendant.

### ii.    Defendant speaks with jailhouse informants

In 2012, Skipper learned that defendant had violated his parole and had him arrested. With the assistance of the Los Angeles County Sheriff's Department, Skipper and his partner, Detective Rick Peterson, arranged a "*Perkins* operation," in which two confidential informants, Jose and Raymond, were placed in a cell with defendant while wearing body wires.

In order to "stimulate conversation" about the murder between defendant and the informants, Skipper and Peterson interviewed defendant. They told him that they were investigating a murder from 1995, that they suspected he was involved, and that they had found his DNA at the crime scene. They mentioned Jonathan Ross, also known as "Never," a known confederate of defendant, along with other names, to see if that would provoke a reaction in defendant. Skipper testified he had no idea if Ross was involved in the homicide, but knew Ross and defendant had been arrested together twice before.

Back in the cell with the informants, defendant discussed the murder investigation with them. In that conversation, defendant never directly admitted committing the murder, and indeed appears to have denied it repeatedly. There was extensive discussion, however, about Ross and the possibility that he had informed on defendant, the relevant portions of which we summarize below.

Jose first suggested a "rat" had told the police that defendant was involved in the murder. Raymond confirmed with defendant that the police had mentioned Ross, whom Raymond referred to as Never. Jose said, "Anyone who was there with you and they were, that's your fucking mole." He continued, "There's only one way to deal with them. You're gonna have to get to them."

Later, defendant asked the informants what he should do. Raymond said that maybe the police had Ross and "the other fool."[2] Jose said, "Eliminate the fucking rat and get rid of the problem." Raymond agreed "someone's telling on you," and "[i]t kinda looks like Never . . . ." Jose asked if defendant thought Ross was informing on him. Defendant said he had also heard from some "homies" that Ross was "a rata."

Raymond said defendant could have Ross "whacked, but that's up to you." Jose said he and Raymond could find Ross.

_____

[2] The "other fool" presumably was one of the other names mentioned by Skipper and Peterson when interviewing defendant. In a later recorded conversation with an undercover sheriff's deputy, defendant said the police "mentioned another name," but the person had been deported and defendant did not think that person would inform on him in any event.

Later, Jose again asked if defendant believed Ross "snitched" on him, and defendant said yes, because Ross had been "acting weird" as a result of defendant having sex with and eventually marrying Ross's girlfriend.  Asked what defendant would do if he got out of custody, defendant said he would go to Ross and "grab him," and "get it out of him," presumably referring to finding out why Ross informed on him.

After further discussion, Raymond asked, "What are we gonna do[,] homes?  Fucking whack him?"  Defendant said, "Yeah.  I need you guys to, uh, help me out.  A favor for a favor, it would be just like the movies."

Later, under the guise of wanting to make sure Ross was the correct person to kill, Jose asked if defendant was sure that Ross "knows what went down, and you know for a fact that it was him."  Jose said, "Now, if you know that he's the fucking rat and he's the only one that knows, then you tell me that you know that it[']s him . . . ."  Defendant demurred, stating, "I can't say all that, 'cause as far as I know, that shit never happened."  He surmised from what the police had told him during his interview, however, that it was Ross who had informed on him.  Jose said, "But at the same time, right, you want me to fucking take this fool out because he's a fucking witness, period, right?"  Defendant said, "Yeah."

They discussed price, with Raymond saying he might ask for defendant's car and a "G," to which defendant did not object.

### iii. Defendant communicates with an undercover deputy posing as a hitman

An undercover sheriff's deputy, Dylan Navarro, posed as a hitman and met with defendant at the county jail.  Due to

7

"human error," only Navarro's side of the conversation was recorded. At trial, Navarro testified as to what was said.

Navarro intimated to defendant that he had been sent by Jose and Raymond. He asked if defendant still wanted to move forward with the plan discussed with Jose and Raymond, and defendant nodded yes. They discussed payment of $1,000 and an old car, and Navarro said if defendant was unable to pay, he could work for Navarro in a criminal capacity. Navarro testified he gave defendant multiple opportunities to change his mind and back out, but defendant "never swayed away from what he wanted, and that was for Jonath[a]n Ross to be killed."

Navarro asked defendant whether he committed the 1995 murder. At one point, defendant responded by holding his hand as if he was holding a gun. At another point, he said he did not commit the murder, but was smiling, nodding his head, and making air quotation marks with his fingers as he said it. Defendant said Ross was the only one who could "put him" at the scene of the crime. Defendant also said he (defendant) had gotten rid of the gun.

Because of the failed recording, Skipper and Peterson concocted a ruse to set up another meeting between defendant and Navarro. A detective from the Gardena Police Department visited defendant and told him, falsely, that Ross had been shot. The detective said Ross was in critical condition but would survive. The detective claimed to be visiting defendant because she had heard that both Ross and defendant had been interviewed by the Redondo Beach police, and she wanted to know if defendant knew anything about the attack on Ross.

Navarro then went to visit defendant in jail a second time. This encounter was recorded. Navarro told defendant that

8

Navarro and an associate shot Ross six times in the chest. Defendant said the Gardena Police detective told him Ross was in critical condition but would live. Navarro said he was "going to try and handle this," "[b]ut I gotta know you're with this, you know?" Defendant said, "Yeah," and then proceeded to discuss payment, agreeing to pay Navarro $2,000 now instead of $1,000.

Later, Navarro said he would go find "that fool" and "make sure I finish this." He asked if defendant was "good with that," and defendant said, "Oh, yeah, yeah, yeah." Then, later, Navarro said, "As soon as I walk away[,] dawg, as soon as . . . I hang up this phone, that fool Never is dead[,] dawg. You're good with that?" Defendant said, "Yes." Navarro made additional references to killing Ross throughout the conversation, and defendant continued to agree to the plan.

### b. Assault with a firearm, assault on a peace officer, resisting, delaying, or obstructing a peace officer, and possession of a firearm by a felon

At some point, defendant was released from custody. On February 15, 2017, defendant went to the home of Andres Gonzalez. According to Gonzalez, he and defendant had been friends for about a year. Defendant wanted to collect $40 for some automobile parts Gonzalez had bought from him. Gonzalez told defendant he thought he had already resolved the debt. Defendant drew a gun and shot Gonzalez in the leg. Gonzalez described the gun as silver, and testified it looked like a gun he had seen defendant with before.

Later that day, police converged on defendant as he pulled his vehicle into the driveway of his apartment complex. A police sergeant ordered defendant to turn off his car and get out with

9

his hands up. Defendant quickly accelerated his vehicle in reverse, colliding with a vehicle occupied by Detective Ryan Yee. Defendant then drove his vehicle forward towards the rear of the apartment complex, exited the vehicle, and fled on foot.

Detective Edward Wenke and Sergeant Brian Messina caught up to defendant as he was trying to get inside his apartment. When he ignored their orders to stop, they used their tasers on him. Defendant fell to the ground but tried to get up to go inside. More police arrived and subdued defendant. Defendant had a silver revolver in his pocket.

## 2. Defense evidence

Defendant testified on his own behalf. The trial court permitted defendant to present his testimony as a "long narrative," with the trial court asking questions, because defense counsel had a "strong suspicion that he would suborn perjury if he were to direct specific questions" to defendant.

Defendant denied shooting Emery or having any involvement in that crime. He claimed it was the informants' idea to harm Ross, and he felt "pressured" to go along with it. When Navarro met with him the second time, defendant had found out from his mother that Ross had not actually been shot, and he "was just playing the game with" the police when he spoke with Navarro.

Defendant acknowledged being with Gonzalez the day Gonzalez was shot, but testified it was another person who sought the $40 for the auto parts, and defendant left before there was any violence. He did not accelerate his car backwards towards Detective Yee; rather, he intended to go forward and his car rolled back slightly. At the time he did not know the occupants of the vehicle behind him were police officers.

10

## PROCEDURAL BACKGROUND

An information charged defendant with assault with a firearm (Pen. Code,[3] § 245, subd. (a)(2)) (count 1), assault upon a peace officer (Yee) (§ 245, subd. (c)) (count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3), resisting, delaying, or obstructing a peace officer (Messina and Wenke)[4] (§ 148, subd. (a)(1)) (count 4), murder of Emery (§ 187, subd. (a)) (count 5), and solicitation of murder of Ross (§ 653f, subd. (b) (count six).

On count 1, assault with a firearm, the information alleged enhancements for infliction of great bodily injury (§ 12022.7, subd. (a)) and personal use of a firearm (§ 12022.5, subds. (a), (d)).  On counts 1, 2, and 3, the information alleged that defendant had suffered a prior conviction subjecting him both to sentencing under the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12.) and a prior serious felony enhancement under section 667, subdivision (a)(1).  The information further alleged five prior convictions subjecting defendant to enhancements under section 667.5.

During trial, the trial court granted the prosecution's motion to amend the information to allege an additional firearm enhancement under section 12022.53 to count 1, assault with a firearm, and a firearm enhancement under section 12022.5, subdivision (a) to count 5, murder.[5]

---

[3] Undesignated statutory citations are to the Penal Code.

[4] During trial, the prosecution chose to proceed only as to Wenke.

[5] The minute order states that the trial court granted the prosecution's motion to amend the information to add a section

The jury found defendant guilty of all six counts, and found the great bodily injury and firearm allegations true.

Defendant waived jury trial on the prior conviction allegations. The prosecution opted not to proceed on the prior conviction allegations under section 667.5, and to prove only the prior serious felony conviction supporting sentencing under the Three Strikes law and the enhancement under section 667, subdivision (a)(1). The trial court asked if defendant had any objection to the prosecution not pursuing the section 667.5 enhancements, and defense counsel said no. The trial court then found that defendant had suffered a prior conviction in 2006 for purposes of the Three Strikes law and section 667, subdivision (a)(1).

At sentencing, the trial court denied defendant's motion for a new trial and motion to strike the prior strike conviction. The trial court then imposed both a determinate and indeterminate sentence. The determinate sentence consisted of the following: on count 1, the high term of four years doubled to eight years because of the prior strike, plus a three-year enhancement under section 12022.7, a five-year enhancement under section 667, subdivision (a)(1), "and an additional ten-year term which is the high term for the enhancement of [section] 12022.53"; on count 2, 32 months consecutive, which was one-third the midterm doubled; on count 3, two years, stayed pursuant to section 654; on count 4, 364 days consecutive; and on count 6, four years consecutive, which was one-third the midterm doubled.

12022.53, subdivision (d) enhancement to the murder count, and does not mention any amendment to count 1. This does not reflect the trial court's oral pronouncement or the verdict forms.

The trial court also imposed a consecutive indeterminate life term on count 5, with minimum parole eligibility at 15 years. The trial court struck the firearm enhancement on count 5. Defendant's total sentence therefore was 47 years, 8 months, 364 days to life. The trial court awarded defendant 793 actual days of credit, but denied him conduct credits because of his murder conviction.

The trial court imposed a restitution fine of $3,000 under section 1202.4, subdivision (b), a parole revocation fine of $3,000 under section 1202.45, a court security fee of $240 under section 1465.8, and a criminal conviction assessment of $180 under Government Code section 70373.[6] The court stated sua sponte that defendant had the ability to pay the fines and fees given the length of his sentence, "even with minimal prison earnings."

Defendant timely appealed.

Additional procedural background is provided in the relevant sections of our Discussion, *post*.

---

[6] In its oral pronouncement of judgment, the trial court imposed a court security fee of $200 and a criminal conviction assessment of $150. This was incorrect. (See 1465.8, subd. (a)(1) [requiring fee of $40 for every criminal offense conviction]; Gov. Code, § 70373, subd. (a) [requiring fee of $30 per felony or misdemeanor].) As the parties agree, the amounts listed in the abstract of judgment are correct.

13

## DISCUSSION

### A. The trial court did not abuse its discretion by admitting a redacted photograph of defendant into evidence without additional redactions

Defendant argues the trial court abused its discretion by admitting a redacted photograph of defendant into evidence without additional redactions. We disagree.

#### 1. Proceedings below

During the testimony of Julia Lindman (Lindman), one of the witnesses to the shooting of Emery, the prosecution showed her a booking photograph of defendant from 2003. The jury did not see the photograph and was not told the photograph was of defendant; the trial court described it for the jury as "an image just of the face of a man." The trial court admitted the photograph into evidence.

The prosecution asked Lindman if the "skin tone" of the person in the photograph was "similar or consistent" with that of the shooter. She said yes. On cross-examination, Lindman stated that all she could recall of the shooter was his dark skin color, and could not otherwise describe or identify him.

Outside the presence of the jury, defense counsel objected to the admission of the booking photograph as "patently suggestive." The trial court confirmed that the prosecution intended to have a later witness identify defendant as the subject of the photograph, and expressed its own concern that the jury might "go farther than they should" and assume Lindman actually identified defendant as the shooter, rather than just identifying his skin tone.

14

After further discussion, the parties agreed that the prosecution would redact the photograph to "block out all identifying features" apart from skin tone. The prosecution then would admit different, unredacted photographs of defendant from around the time of the shooting so the jury could compare defendant's skin tone in the unredacted photographs to the skin tone in the redacted photograph. The trial court stated it would withdraw the photograph shown to Lindman from evidence, and would replace it with the redacted photograph when the prosecution provided it.

Later, the prosecution provided a version of the 2003 booking photograph with defendant's eyes, nose, and mouth redacted, and the ears, jawline, forehead, cheeks, and hair visible. Defense counsel argued the redaction was insufficient, and proposed blocking off everything but the forehead. The prosecution objected to further redaction, arguing "skin tone needs to be seen in more context than that."

The trial court ruled that the photograph be redacted to show only the hair and forehead. The trial court concluded "that the jury will get the point, that they're being shown what the skin tone was perceived to be of the face of the person, and that's all." The court concluded "that the hair is not distinctive. It is dark hair but with dark-complected people, dark hair is much what you would expect . . . ." Defense counsel acknowledged the trial court had ruled, but reasserted its request that the hair be redacted as well.

During Frank Dozier's testimony, the trial court admitted the photograph into evidence, redacted below the forehead as

15

instructed by the court, and showed it to Dozier.[7] The prosecution asked if "the skin tone and complexion" was "consistent with what you saw" the night of the shooting. Dozier said, "If you're asking me if it could possibly be, yes, it could possibly be." The prosecution asked, "Is it inconsistent in any way?" Dozier replied, "Not from what I see, no."

On a later day, the prosecution admitted into evidence three unredacted booking photographs, labeled as exhibits 40-A, 40-B, and 40-C, which Skipper identified as photographs of defendant. None of these was the same photograph as the redacted booking photograph admitted during Dozier's testimony.

The next day, outside the presence of the jury, defense counsel objected that defendant's hairstyle in the exhibit 40 unredacted booking photographs was sufficiently similar to the hairstyle visible in the redacted booking photograph that the jury would realize the redacted photograph was of defendant. The trial court concluded defendant's hairstyle in the photographs was "not at all unique," and did not think the unredacted

---

[7] According to the reporter's transcript, the redacted photograph was admitted as exhibit 26-A. We have reviewed the trial exhibits, and the photograph redacted as the trial court described, with only the forehead and hair visible, is labeled as exhibit 26-B. Exhibit 26-A, in contrast, appears to be the first redacted photograph the prosecution prepared, which left the ears, cheeks, and jawline visible along with the forehead and hair. We need not resolve this discrepancy; although the parties in their briefing refer to the photograph entered into evidence and shown to the jury as exhibit 26-A, they do not dispute that the photograph showed only the forehead and hair, consistent with exhibit 26-B.

photographs would lead the jury to "think that [defendant] is necessarily the subject of [the] cropped photo."

During closing argument, it appears the prosecution displayed both the redacted photograph and one of the unredacted exhibit 40 photographs to the jury for comparison. The prosecution stated, "Julia Lindman said she remembered the skin tone of the shooter. And she looked at this exhibit [presumably indicating the redacted photograph] and said, 'That is the skin tone of the person who committed that murder. I remember.' This is the defendant in 1999 [presumably indicating one of the Exhibit 40 photographs]. That's the same skin tone, or as close as you could find."

The prosecution continued, "Frank Dozier also remembered the skin tone of the shooter. He said he turned and saw this clear side profile. He said, 'Yeah, that looks like it.' Same skin tone, according to Frank Dozier." The prosecution further referred to Jacqueline Emery's testimony that the shooter's skin tone was " 'coffee with a lot of cream,' " and stated, "That's a pretty apt description for the defendant in the '90s. Coffee with a lot of cream."

## 2.    Analysis

On appeal, defendant argues, as he did below, that given the similarity of the hairstyle and hairline in the redacted photograph to those in the exhibit 40 photographs, a juror could conclude that the person in the redacted booking photo was defendant. Defendant argues this would create "the impression that Lindman, who had only identified the shooter's skin tone, had actually identified [defendant] as the shooter." Defendant contends the trial court abused its discretion by failing to exclude

17

the redacted photograph from evidence, or, alternatively, by not redacting it further to conceal the hair.

In support of his argument, defendant invokes Evidence Code section 352, which grants trial courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." The Attorney General argues defendant has forfeited any argument under that statute because he did not raise it below. Because we conclude defendant's argument fails on the merits, we need not decide whether he preserved it for appeal.

We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.) Having examined the photographs ourselves, we find no abuse here. Initially, it is clear that none of the exhibit 40 photographs is the same as the redacted photograph. Thus, no juror would conclude that any of the exhibit 40 photographs was an unredacted version of the redacted photograph. We agree with the trial court, moreover, that the hairlines and hairstyles depicted in the exhibit 40 photographs, some of which are similar to those in the redacted photograph, are not so distinctive that jurors would conclude the redacted photograph was of defendant. We cannot say the trial court exceeded the bounds of its discretion by admitting the redacted photograph without taking additional measures to disguise defendant's identity.

Even assuming the trial court erred by admitting the photograph, prejudice was unlikely given the mental steps a juror would have to take to conclude, incorrectly, that Lindman identified defendant. First, a juror would have to look at the

redacted photograph and the exhibit 40 photographs side by side and conclude they depicted the same person. Then, the juror would have to recall, despite only the redacted photo being in evidence, that Lindman in fact testified while viewing an unredacted version of that photograph. Finally, the juror would have to ignore that Lindman unequivocally testified she could identify only the skin tone of the shooter, and could not otherwise identify or describe him, a point reinforced by the prosecution's closing, which emphasized Lindman's identification of the skin tone. In short, we do not think it reasonably probable that the admission of the redacted photograph tipped the balance in this case.

## B. Defendant forfeited his claim of prosecutorial misconduct, and fails to show prejudice

Defendant claims the prosecution committed misconduct during closing argument by appealing to the jury's sympathy for Emery and his family. This contention is forfeited. On the merits, defendant fails to show prejudice.

### 1. Proceedings below

Defendant identifies three portions of the prosecutor's closing argument he claims were improper. First, at the beginning of the closing, after describing defendant's alleged offenses and his willingness to lie and kill, the prosecutor stated, "Enough is enough. The time has come to hold the defendant accountable for these actions, dating back to the mid '90s. The time has come to do justice for the family of Mr. Emery, for the Redondo Police Department, for the Gardena Police Department, for the communities in which he has wreaked havoc. That's what I'll be asking you all to do today. [¶] Let's go through it. And

before I start, I just want you to remember Edward. When he was killed, he left a family without a husband, without a father, without a loved one. Just remember Mr. Emery, as we go forward."

Then, at the end of the argument, the prosecutor stated, "But what I'm asking you to do is hold him accountable, because he never will himself. He plays by his own rules. He does not conform to the rules of a civilized society. If it's up to him, he'll never be held accountable. [¶] All 12 of you have that option today to do that. Do justice for the family of Mr. Emery. Do justice to his memory. Follow the law. Follow the law and find him guilty of murder . . . ."

On rebuttal, the prosecutor concluded by stating, "That's all I have to say, and I hope that you follow the law, follow your gut, do justice for the family of Mr. Emery, and hold this man accountable and say, 'Enough is enough.' "

### 2. Analysis

Defendant's counsel did not object to the prosecutor's remarks challenged here or request an admonition to the jury. Thus, the claim of misconduct is forfeited.[8] (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 919 (*Amezcua*).) Although defendant raised the issue in his motion for a new trial, that was

---

[8] We note that defense counsel appeared to address the prosecutor's remarks in his own closing, stating, "It sounds simple [to be fair and impartial], but it's harder than you think it is. Because we've heard so much inflammatory evidence. And because there's a homicide involved, we look at the suffering by the victim. And we say look at the injury, the victim's family, and, yes, we will look at that. But this is not your province."

insufficient to preserve the issue for appeal. (See *People v. Adams* (2014) 60 Cal.4th 541, 578 [prosecutorial misconduct challenge forfeited for lack of timely objection when raised for first time in postverdict motion for new trial].)

Were we to reach the merits, we would agree the prosecution's statements were improper. "Although a prosecutor may vigorously argue the case, appeals to sympathy for the victim during an objective determination of guilt fall outside the bounds of vigorous argument." (*Amezcua, supra*, 6 Cal.5th at p. 920.) Here, the prosecution asked the jury to "remember" Emery, and that his death deprived his family of a loved one. The prosecution urged the jury to "do justice" for Emery and his family. These comments inappropriately played to the jury's sympathy for the victim and his family.

We disagree with defendant, however, that these improper comments prejudiced him. " ' "A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*People v. Young* (2019) 7 Cal.5th 905, 932–933 (*Young*).)[9] Here, the challenged statements constituted a "few remarks in a much longer closing argument, and an even longer trial." (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1344.) There was compelling evidence against defendant, including his DNA at the scene of the crime, the shooter escaping in a vehicle matching defendant's,

---

[9] Defendant fails to show " 'a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" [Citation.]' " (*Young, supra*, 7 Cal.5th at p. 932.) We thus evaluate prejudice under the state law standard. (See *ibid.*)

21

and recordings clearly establishing defendant's desire to eliminate the person he believed had informed on him. (*Ibid.* [prosecutorial misconduct unlikely to prejudice defendant "given the strong evidence of his guilt."].) It is not reasonably probable the jury would have reached a result more favorable to defendant absent the misconduct.[10]

## C.     The trial court did not abuse its discretion by denying defendant's motion for a new trial

Defense counsel moved for a new trial based on the admission of the redacted photograph and the prosecution's improper statements during closing argument. The trial court denied the motion. Defendant contends this was an abuse of discretion. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 957 [denial of motion for new trial reviewed for abuse of discretion].)

As set forth *ante*, neither the admission of the photograph nor the prosecution's statements constituted prejudicial error. Accordingly, the trial court did not abuse its discretion by denying the motion for a new trial. (*People v. Caro* (2019) 7 Cal.5th 463, 525 [trial court may grant new trial motion only upon showing of reversible error].)

---

[10] Defendant contends the fact the jury requested readback during deliberations indicated "it was a close case on the contested charges." The requested readback was of testimony concerning the assault on a peace officer charge. The request does not indicate the murder charge was a "close case."

22

**D.   Defendant forfeited his challenge to the restitution fine and fees imposed, and imposition of those costs was constitutional**

As set forth above, the trial court imposed a $3,000 restitution fine, $240 court security fee, and $180 criminal conviction assessment, and determined sua sponte that defendant had the ability to pay those costs with wages earned during his lengthy incarceration.  Defendant argues that the trial court's assumption that he would earn enough in prison to pay the costs was incorrect.  He further argues that error was of constitutional dimension, because *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) held that due process prohibits imposition of fines and fees without a (proper) determination that the defendant has the ability to pay them.  (*Id.* at p. 1164.)

As an initial matter, defendant forfeited this argument by not objecting to the imposition of the fines and fees below.  (See *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1033–1034 [challenge to imposition of restitution fine and court assessments forfeited by failure to object in trial court].)

Were we to reach the merits, we would reject defendant's challenge because *Dueñas* is distinguishable.  In *Dueñas*, an unemployed, homeless mother with cerebral palsy lost her driver's license when she was unable to pay over $1,000 assessed against her for three juvenile citations.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.)  Thereafter she received multiple convictions related to driving with a suspended license, each accompanied by jail time and additional fees she could not afford to pay.  (*Id.* at p. 1161.)  The trial court rejected Dueñas's request to hold an ability to pay hearing despite undisputed evidence that she was indigent.  (*Id.* at p. 1163.)

23

The appellate court reversed, holding that due process prohibited imposing the same assessments imposed in the instant case and required the trial court to stay execution of the restitution fine until the trial court held an ability to pay hearing. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The *Dueñas* court expressed concern for "the cascading consequences of imposing fines and assessments that a defendant cannot pay," noting that Dueñas's case " 'doesn't stem from one case for which she's not capable of paying the fines and fees,' but from a series of criminal proceedings driven by, and contributing to, Dueñas's poverty." (*Id*. at pp. 1163–1164.) The court referenced "the counterproductive nature of this system and its tendency to enmesh indigent defendants in a cycle of repeated violations and escalating debt." (*Id*. at p. 1164, fn. 1.)

In *People v. Caceres* (2019) 39 Cal.App.5th 917 (*Caceres*), we declined to apply *Dueñas* beyond its "extreme facts." (*Id*. at p. 923.) We thus rejected a *Dueñas* challenge brought by a defendant convicted of criminal threats, concluding that offense "on its face is not a crime either 'driven by' poverty or likely to 'contribut[e] to' that poverty such that an offender is trapped in a 'cycle of repeated violations and escalating debt.' [Citation.] A person may avoid making criminal threats regardless of his or her financial circumstances, and the imposition of $370 in fees and fines will not impede [the defendant]'s ability to avoid making criminal threats in the future." (*Caceres*, at pp. 928–929.)

Here, as in *Caceres*, defendant's offenses—murder, solicitation of murder, assault with a firearm, assault on a peace officer, resisting arrest, and unlawful possession of a firearm— are not crimes likely to trap him "in a 'cycle of repeated violations

24

and escalating debt,' " particularly when he may abstain from committing those offenses in the future regardless of his financial circumstances. (*Caceres*, *supra*, 39 Cal.App.5th at pp. 928–929.) *Dueñas* is therefore inapplicable to the facts of this case and does not provide a basis to challenge the imposition of the restitution fine and assessments.

## E. Defendant fails to demonstrate ineffective assistance of counsel

Defendant argues that to the extent he forfeited his challenges on appeal for failure to object below, he was denied his constitutional right to effective assistance of counsel. To demonstrate ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1406.)

As set forth *ante*, defendant has failed to show prejudicial error in his challenges to the admission of the photograph and prosecutorial misconduct, and we have rejected his constitutional challenge to the fines and fees. Thus, assuming arguendo his counsel's performance was deficient, it did not prejudice the defense.

Defendant notes that, in addition to not raising a constitutional objection to the fines and fees, defense counsel also did not object to the $3,000 fine under section 1202.4, subdivision (c), which permits the trial court to consider a defendant's ability to pay when imposing a restitution fine above the $300 statutory minimum. In other words, even absent a constitutional basis to object to the trial court's determination that defendant had the ability to pay the fine, defendant had a

25

statutory basis to object to the extent the fine exceeded the statutory minimum, and defense counsel did not do so.

The record is insufficient to address this claim on direct appeal. " ' " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " ' [Citation.] 'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' [Citation.]" (*People v. Campbell* (2020) 51 Cal.App.5th 463, 504.)

Here, the record does not disclose why defense counsel did not object to the trial court's sua sponte determination that defendant had the ability to pay the fine. There are conceivable satisfactory explanations, including that defense counsel may have known defendant had the ability to pay the fine, or at least would not be able to prove otherwise.

Defendant disputes this possibility, claiming that his indigence, as indicated by his representation by appointed counsel below and on appeal, conclusively establishes his inability to pay the fine. Defendant's inability to afford an attorney does not conclusively establish he cannot pay the much lower cost of a $3,000 fine. We thus cannot address in this direct appeal defendant's claim of ineffective assistance of counsel based on the lack of objection to the imposition of a fine above the statutory minimum. Accordingly, we express no opinion as to whether defense counsel's performance was deficient for failing to object to the restitution fine under section 1202.4, subdivision (c).

26

**F.     The trial court properly doubled the sentence on count 6 under the Three Strikes law**

The information alleged that "prior to the commission of that offense or offenses alleged in Count 1, 2, and 3, the defendant . . . had been convicted of the following serious and/or violent felony, as defined in Penal Code section 667(d) and Penal Code section 1170.12(b), and is thus subject to sentencing pursuant to the provisions of Penal Code section 667(b)–(j) and Penal Code section 1170.12," also known as the Three Strikes law.  (See *People v. Marcus* (2020) 45 Cal.App.5th 201, 208.)  Accordingly, the information indicated that the sentences on counts 1 through 3 should be doubled, but did not so indicate for the other three counts.  The prosecution's sentencing memorandum, however, filed two days before sentencing, recommended the trial court apply the Three Strikes law to count 6, solicitation of murder of Ross, as well as to counts 1 through 3.[11]  The trial court did so, doubling the sentences on those four counts.

Defendant contends that because the information alleged the prior strike only as to counts 1 through 3, the trial court erred by doubling the sentence on count 6.  The Attorney General argues defendant forfeited this challenge by not objecting below.  On the merits, the Attorney General argues that so long as the information alleges a prior strike conviction, it need not be

---

[11] We presume the prosecution did not pursue Three Strikes sentencing on count 4, resisting a peace officer, because it was a misdemeanor and on count 5, murder of Emery, because defendant committed the murder before he incurred the strike conviction.  The sentences on those counts are not at issue in this appeal.

27

pleaded on a count-by-count basis.  We conclude defendant's argument fails on the merits and do not reach the forfeiture question.

The purpose of the Three Strikes law is "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious or violent felony offenses."  (§ 667, subd. (b).)  By its own terms, it applies "in *every case* in which a defendant has one or more prior serious or violent felony convictions . . . ."  (*Id.*, subd. (f)(1), italics added; see also § 1170.12, subd. (d)(1).)  Indeed, despite the "general rule" that "the selection of criminal charges is a matter subject to prosecutorial discretion," "the Three Strikes law limits that discretion and requires the prosecutor to plead and prove each prior serious felony conviction."  (*People v. Roman* (2001) 92 Cal.App.4th 141, 145 (*Roman*); see § 667, subd. (f)(1) ["The prosecuting attorney *shall* plead and prove each prior serious or violent felony conviction . . . ."], italics added; see also § 1170.12, subd. (d)(1).)  The prosecution may move the court to dismiss the prior conviction allegation for insufficient evidence or "in the furtherance of justice" (§§ 667, subd. (f)(2), 1170.12, subd. (d)(2)), but may not "unilaterally strike" the allegation.  (*Roman*, at p. 145.)

Because application of the Three Strikes law is based on "a defendant's prior conviction status," a status that "does not change from one count to another," our Supreme Court has described the Three Strikes law as "a single comprehensive and indivisible sentencing scheme that either does or does not apply."

(*People v. Garcia* (1999) 20 Cal.4th 490, 502 (*Garcia*).)[12] Accordingly, "it is appropriate to allege [defendant's prior conviction] status only once as to all current counts . . . ." (*Garcia*, at p. 502.)

Defendant concedes "[t]here is no statutory requirement that a . . . prior strike conviction be pleaded on a count-by-count basis." Defendant argues, however, as does the dissent, that "when a prior strike conviction is specifically alleged as to a particular count or counts in the information, but not as to all counts, the charging document necessarily has not provided the defendant with notice that the prosecution could seek to impose a sentence under the Three Strikes law as to any count other than those as to which the prior strike was alleged." In other words, by choosing to allege the prior strike only as to counts 1 through 3, the prosecution led defendant to believe he would not be sentenced under the Three Strikes law on count 6.

We conclude the trial court properly doubled the sentence on count 6 under the Three Strikes law. In *People v. Morales* (2003) 106 Cal.App.4th 445 (*Morales*), our colleagues in Division Five held that when the prosecution pleaded and proved a prior strike alleged as to one felony count, the strike applied to the two other felony counts in the information, although the prior strike had not been pleaded as to those counts.[13] (*Morales*, at

---

[12] *Garcia* held that courts nonetheless may strike prior conviction allegations on a count-by-count basis. (*Garcia, supra,* 20 Cal.4th at p. 502.)

[13] The strike allegation in *Morales* read, " 'It is further alleged pursuant to Penal Code sections 1170.12(a) through (d) and 667(b) through (i) *as to count(s) 2* that said defendant(s), Manuel Morales, has suffered the following prior convictions of a

29

pp. 447–448.) Consistent with the principles we outlined above, the *Morales* court reasoned that "[p]rior conviction findings fall in the category of [enhancements] that describe the offender rather than the offense." (*Id.* at p. 455.) "In order for enhanced recidivist sentencing to occur, all that is necessary is that the defendant previously had been convicted of a . . . violent felony such as occurred in this case." (*Ibid.*)

The court relied on language from section 667, including the language from section 667, subdivision (f) that the sentencing provisions " 'shall be applied in every case in which a defendant has a prior felony conviction . . . .' " (*Morales*, *supra*, 106 Cal.App.4th at p. 455, quoting § 667, former subd. (f)(1).) "Fairly construed, sections 667 and 1170.12 require enhanced sentencing once a prior violent felony conviction has been pled and found to be true, unless the court dismisses the prior conviction finding pursuant to section 1385, subdivision (a)." (*Morales*, at p. 456.) The appellate court therefore concluded the trial court erred by not doubling the sentences on the two counts to which the strike was not pleaded.[14] (*Morales*, at p. 456.)

*Morales* is on point. Defendant argues, however, that *Morales* is no longer good law after our Supreme Court's recent decision in *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*). In *Anderson*, the court held that an information alleging a 25-year-to-life vicarious firearm enhancement under section 12022.53, subdivision (e) as to a single murder count did not

---

serious or violent felony or juvenile adjudication . . . .' " (*Morales*, *supra*, 106 Cal.App.4th at p. 450, capitalization omitted.)

[14] The appellate court remanded the case for the trial court to exercise its discretion whether to strike the strike as to either count. (*Morales*, *supra*, 106 Cal.App.4th at p. 457.)

provide adequate notice that the prosecution would seek the same enhancement on five robbery counts as to which the enhancement was not pleaded. (*Anderson*, at p. 950.)

The court cited the requirement in section 1170.1, subdivision (e) that sentence enhancements " 'shall be alleged in the accusatory pleading,' " a requirement mirrored in the firearm enhancement statute itself (§ 12022.53, subd. (j)), as well as the requirement in section 12022.53, subdivision (e) that the prosecution "ple[a]d and prove[ ]" the allegations underlying the vicarious firearm enhancement. (*Anderson*, *supra*, 9 Cal.5th at p. 953.) "Beneath all three statutory pleading requirements lies a bedrock principle of due process," namely that " ' "[a] criminal defendant must be given fair notice of the charges against him in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair surprise at trial." ' [Citation.] This goes for sentence enhancements as well as substantive offenses: A defendant has the 'right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes.' [Citation.]" (*Ibid.*)

These "statutory pleading requirements . . . , read against the backdrop of due process, require more than simply alleging the facts supporting an enhancement somewhere in the information." (*Anderson*, *supra*, 9 Cal.5th at p. 956.) "A pleading that alleges an enhancement as to one count does not provide fair notice that the same enhancement might be imposed as to a different count. When a pleading alleges an enhancement in connection with one count but not another, the defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the second

31

count, and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial." (*Ibid.*)

Thus, "[f]air notice requires that every sentence enhancement be pleaded in connection with every count as to which it is imposed." (*Anderson*, *supra*, 9 Cal.5th at pp. 956–957.) "Neither the relevant statutes nor the due process clause requires rigid code pleading or the incantation of magic words. But the accusatory pleading must adequately inform the defendant as to how the prosecution will seek to exercise its discretion." (*Id.* at p. 957.)

In our view, the notice concerns articulated in *Anderson* are not present here. The information in the instant case expressly invoked the Three Strikes law, and the plain language of that law provided adequate notice that it must apply to *all* eligible offenses unless the trial court exercised its discretion to strike the strike.

As discussed, a defendant's prior conviction status is not based on the circumstances of his current offense, and thus "does not change from one count to another." (*Garcia*, *supra*, 20 Cal.4th at p. 502.) The "single comprehensive and indivisible sentencing scheme" that is the Three Strikes law "either does or does not apply." (*Ibid.*) This is clear from the language of the Three Strikes law itself, stating it "*shall* be applied in every case in which a defendant has one or more prior serious or violent felony convictions . . . ." (§ 667, subd. (f)(1), italics added; see also § 1170.12, subd. (d)(1).) Pleading and proof of a prior strike allegation is sufficient to subject a defendant to Three Strikes sentencing on all eligible offenses, without alleging the strike on a count-by-count basis. (See *Garcia*, at p. 502.)

Further, as discussed, the plain language of the Three Strikes law makes clear that the prosecution lacks discretion to allege prior strikes on some counts but not others. (§ 667, subd. (f)(1) ["The prosecuting attorney shall plead and prove each prior serious or violent felony conviction . . . .]; § 1170.12, subd. (d)(1); see *Roman, supra*, 92 Cal.App.4th at p. 145.) Thus, although the prosecution drafted the information in the instant case inartfully, and purported to allege the prior strike only as to some eligible counts, it would be evident to defendant on the face of the Three Strikes law that the prior strike would apply to all eligible counts, unless the trial court dismissed the strike either on its own motion or in response to a motion by the prosecution or defense. (See §§ 667, subd. (f)(1)–(2), 1385.) In short, an information invoking the Three Strikes law and alleging a prior strike, in tandem with the language of the Three Strikes law itself, provides adequate notice that the prosecution is charging the defendant as a recidivist offender subject to the Three Strikes sentencing regime on all eligible offenses.[15]

*Anderson*, in contrast, involved an enhancement under section 12022.53, subdivision (e), which imposes "a 25-year-to-life enhancement based on vicarious liability for the injurious discharge of a firearm by a coparticipant in a gang-related offense." (*Anderson, supra*, 9 Cal.5th at p. 951.) As a firearm

---

[15] Division Three of this court has held that an information alleging a prior conviction *without* any reference to the Three Strikes law did not provide adequate notice the defendant was subject to Three Strikes sentencing. (*People v. Sawyers* (2017) 15 Cal.App.5th 713, 718, 721.) In contrast, here, the information expressly invoked the Three Strikes law by citing sections 667, subdivisions (b)–(j) and 1170.12.

enhancement, section 12022.53, subdivision (e) falls into the category of enhancements that "arise from the circumstances of the crime," and therefore are based "on what the defendant did when the current offense was committed." (*People v. Coronado* (1995) 12 Cal.4th 145, 157, italics omitted [describing, inter alia, the firearm enhancement under section 12022.5].) Because a section 12022.53 enhancement speaks to the circumstances of a particular count, it follows that it must "be pleaded in connection with every count as to which it is imposed." (*Anderson*, *supra*, 9 Cal.5th at pp. 956–957.)

Section 12022.53, moreover, contains no language limiting the prosecution's discretion to plead or not plead the enhancement. Thus, it is permissible for the prosecution to plead a section 12022.53 firearm enhancement on one count but not another, and a defendant reading an information that does so has no reason to think the enhancement might apply to a count to which it is not pleaded. Rather, "the defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the [other] count . . . ." (*Anderson*, *supra*, 9 Cal.5th at p. 956.)

A defendant has no basis to make such an assumption, however, when an information alleges a prior strike as to some eligible counts but not others. This is because, under the plain language of the Three Strikes law, it applies "in every case" in which a defendant has suffered a prior strike conviction (§§ 667, subd. (f)(1); 1170.12, subd. (d)(1)), and, to borrow *Anderson*'s language, the prosecution expressly *cannot* "ma[k]e a discretionary choice not to pursue" the Three Strikes alternative sentencing regime on all eligible counts. (*Anderson*, *supra*, 9 Cal.5th at p. 956.) Thus, despite the failure of the prosecution

34

in this case to allege the strike on count 6, the language of sections 667 and 1170.12, both of which were cited in the information, provided adequate notice that count 6 also would be subject to a doubled sentence.  In contrast, in *Anderson*, review of the applicable firearm enhancement statute would provide no notice that the enhancement would apply to counts to which the enhancement was not pleaded.

Defendant argues *Anderson*'s holding extends to Three Strikes pleading because *Anderson* relied on the reasoning of *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*), a case involving the "One Strike" law (§ 667.61).  (See *Anderson*, *supra*, 9 Cal.5th at pp. 954–955 [discussing *Mancebo*].)  Defendant suggests the One Strike law and Three Strikes law are analogous for purposes of this case.  As we explain, the One Strike law differs in key respects from the Three Strikes law, and *Mancebo* is not on point.

The One Strike law "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes perpetrated by force . . . ."  (*Mancebo*, *supra*, 27 Cal.4th at p. 741.)  "The section applies if the defendant has previously been convicted of one of [several] specified offenses, or if the current offense was committed under one or more specified circumstances."  (*Id.* at pp. 741–742; § 667.61, subds. (a)–(b), (d)–(e).)  In other words, the One Strike law is similar to the Three Strikes law in that it may be applied based on past convictions, but it is dissimilar in that it may also be applied based on the circumstances of the current offense.  The One Strike law also differs from the Three Strikes law in that it does not restrict the prosecution's discretion whether to plead or not plead allegations justifying imposition of the sentencing regime; instead, "The penalties provided in [the

35

One Strike law] shall apply *only if* the existence of any circumstance specified in subdivision (d) or (e) is alleged in the accusatory pleading . . . ."  (§ 667.61, subd. (o), italics added.)

The One Strike law requires the trial court to impose an indeterminate term of 25 years to life on defendants convicted of an offense "under two or more of the circumstances specified in subdivision (e)" of section 667.61.  (§ 667.61, subd. (a).)  Accordingly, the information at issue in *Mancebo* alleged two such circumstances for each victim—for the first victim, "Kidnap and Use of Firearm," and for the second victim, "Use of Firearm and Tie or Bind Victim."  (*Mancebo, supra*, 27 Cal.4th at pp. 742–743; see 667.61, subds. (a), (e)(1), (3), (5).)  Because the information alleged only two circumstances per victim, the "minimum number" required for indeterminate sentencing under section 667.61, subdivision (a), the One Strike law barred the prosecution from relying on the gun use circumstances also to support firearm enhancements under section 12022.5.  (*Mancebo*, at p. 743; § 667.61, subd. (f).)  The trial court, however, substituted an unpleaded multiple-victim circumstance for the firearm circumstance in order to meet the "minimum number" of qualifying circumstances for purposes of One Strike sentencing, "thereby making gun use available as a basis for imposing the section 12022.5(a) enhancements."  (*Mancebo*, at p. 740.)

Our Supreme Court held it was error to impose the section 12022.5 firearm enhancements.  (*Mancebo, supra*, 27 Cal.4th at p. 744.)  The One Strike law requires that the circumstances supporting enhanced sentencing be pleaded and proved.  (*Id.* at pp. 744–745, citing § 667.61, subd. (f).)  Although the information pleaded, and the prosecution proved, that the defendant committed offenses against two victims, the

36

information never alleged a multiple victim circumstance under section 667.61, subdivision (e). (*Mancebo*, at pp. 744–745.) "In other words, no factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing under section 667.61, subdivision (a). Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under section 667.61, subdivision (a) *and* use the circumstance of gun use to secure additional enhancements under section 12022.5(a)." (*Mancebo*, at p. 745.)

The court concluded that the prosecution had made a "discretionary charging decision" to use the firearm allegations to support One Strike sentencing as opposed to section 12022.5 enhancements. (*Mancebo*, *supra*, 27 Cal.4th at p. 749.) "Because the People elected to plead the enhancement allegations in this manner, the express provisions of [section 667.61,] subdivision (f) restricted the trial court to this application." (*Mancebo*, at p. 749.)

*Mancebo* addressed the notice required when the prosecution makes a *discretionary* charging decision concerning enhancements based on the *circumstances of the underlying offense*. The enhancement in *Anderson* too was discretionary and based on the circumstances of the underlying offense. As in *Anderson*, review of the One Strike law would not have remedied any pleading defects by filling in the missing pieces in the information, and thus the *Mancebo* defendant had no way of

37

knowing from the information that he would be subject to an unpleaded multiple-victim circumstance.

*Mancebo*, like *Anderson*, does not apply to the instant case, in which the information clearly alleged a sentencing regime that on its face is both nondiscretionary and based on the defendant's criminal history rather than the circumstances of his offenses. Citation to the Three Strikes law, along with an allegation of a prior strike, was sufficient to place defendant on notice that all eligible offenses would be subject to the Three Strikes sentencing scheme.

The dissent cites *People v. Williams* (2004) 34 Cal.4th 397, 404–405 (*Williams*) for the proposition that the Three Strikes law does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses. (Conc. & dis. opn. *post*, at p. 3.) *Williams* is not instructive as to the issue before us here.

*Williams* addressed whether, when a defendant is subject to multiple indeterminate Three Strikes sentences, the trial court should impose a prior conviction enhancement under section 667, subdivision (a) on each of the sentences, or only once on the total aggregate sentence. (*Williams*, *supra*, 34 Cal.4th at pp. 400–401). In the context of multiple *determinate* sentences, an earlier Supreme Court opinion had held that, under section 1170.1, prior conviction enhancements could be imposed only once on the total aggregate sentence, whereas offense-based enhancements such as firearm enhancements "enhance the several counts." (*People v. Tassell* (1984) 36 Cal.3d 77, 90, disapproved on other grounds by *People v. Ewoldt* (1994) 7 Cal.4th 380.) *Williams* held that the rule for multiple determinate sentences under section 1170.1 and *Tassell* did not

38

apply for purposes of imposing status-based enhancements on multiple indeterminate Three Strikes sentences, in part because "[t]he Three Strikes law, unlike section 1170.1, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses . . . ." (*Williams*, at pp. 404–405.) Thus, the trial court must apply the prior conviction enhancement "individually to each count of a third strike sentence." (*Id.* at p. 405.)

*Williams* concerned only the imposition of enhancements on Three Strikes sentences. It did not concern what is at issue in the instant case, namely the pleading requirements of the Three Strikes sentences themselves. *Williams* therefore does not suggest, as the dissent implies, that there is no difference between the pleading of status-based prior strike allegations and the pleading of offense-based allegations such as those at issue in *Anderson.*

In sum, the trial court did not err in doubling the sentence on count 6.

## G.    The trial court must strike the enhancement to the assault charge under section 12022.53 and instead impose an enhancement under section 12022.5

On count 1, assault with a firearm, the jury found allegations in support of firearm enhancements under sections 12022.5 and 12022.53 to be true. When sentencing defendant on count 1, the trial court imposed "an additional ten-year term which is the high term for the enhancement of [section] 12022.53." The sentencing minute order and abstract of judgment similarly reflect a 10-year enhancement under section 12022.53, subdivision (a).

39

The parties correctly note this was error. The firearm enhancement under section 12022.53 applies only to specified felonies, and assault with a firearm under section 245, subdivision (a)(2) is not among them. (See § 12022.53, subd. (a).) Also, the enhancement under section 12022.53 does not have a low, middle, and high term, instead imposing fixed penalties depending on how the firearm is used.[16] (§ 12022.53, subds. (b)–(d).)

In contrast, section 12022.5 applies to personal use of a firearm in the commission of an offense under section 245, and imposes an enhancement of 3, 4, or 10 years. (§ 12022.5, subds. (a), (d).) We agree with the parties that the trial court intended to impose an enhancement based on the true finding under section 12022.5 rather than section 12022.53. In our disposition, we direct the trial court to correct this error.

## H. Defendant is entitled to presentence conduct credit

As noted earlier, the trial court awarded defendant 793 actual days of credit, but denied him conduct credits because of his murder conviction. Although section 2933.2, subdivision (a) prohibits defendants convicted of murder from accruing conduct credit, it applies only to murders committed on or after the date the statute became operative, which was June 3, 1998. (§ 2933.2, subds. (a), (d); *People v. Chism* (2014) 58 Cal.4th 1266, 1336.) Because defendant committed murder in 1995, section

---

[16] Briefly, the statute imposes a 10-year enhancement for using a firearm in the commission of a listed felony, a 20-year enhancement for discharging the firearm, and a 25-year-to-life enhancement for discharging the firearm and causing great bodily injury or death. (§ 12022.53, subds. (b)–(d).)

40

2933.2 does not apply to him, and he is instead entitled to conduct credits up to a maximum of 15 percent of his actual period of confinement. (§ 2933.1, subd. (c); *Chism*, at pp. 1336–1337.) The trial court therefore must award defendant 118 days in custody credit, reflecting 15 percent of his 793 days of presentence custody. On this point, the parties agree.

## I.    The trial court must amend the minutes to reflect the striking of the prior prison term enhancements

Although the prosecution moved to strike the enhancements under section 667.5, pertaining to defendant's alleged five prior prison terms, the minute order does not reflect that the trial court granted that motion. The trial court impliedly did so, however, asking defense counsel if there was any objection to striking the enhancements, and then proceeding to rule only on the allegations supporting sentencing under the Three Strikes law and the section 667, subdivision (a)(1) enhancement. The parties agree that the minutes should be amended to reflect the striking of the section 667.5 enhancements, and we direct the trial court to do so.

## DISPOSITION

The judgment is amended to strike the 10-year enhancement on count 1 under section 12022.53, subdivision (a); to impose a 10-year enhancement on count 1 under section 12022.5, subdivision (a); and to grant defendant 118 days in conduct credit in addition to the 793 days of actual credit already granted.  As modified, the judgment is affirmed.  The trial court shall forward the modified abstract of judgment to the Department of Corrections and Rehabilitation.  The trial court also shall amend the minutes for the November 28, 2018 hearing to reflect the striking of the five section 667.5 enhancements.

<u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

BENDIX, Acting P. J.

I concur:

FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CHANEY, J., Concurring and Dissenting.

I would conclude that the trial court imposed an unauthorized sentence when it doubled Elliot Kimo Laanui's sentence on count 6 based on the "Three Strikes" law.

"As a rule, all sentence enhancements 'shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact.' " (*People v. Anderson* (2020) 9 Cal.5th 946, 953 (*Anderson*).) " ' "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." [Citations.] "A criminal defendant must be given fair notice of the charges against him in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair surprise at trial." ' [Citation.] This goes for sentence enhancements as well as substantive offenses: A defendant has the 'right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes.' " (*Ibid.*)

In *Anderson*, the Supreme Court explained that "[a] pleading that alleges an enhancement as to one count does not provide fair notice that the same enhancement might be imposed as to a different count. When a pleading alleges an enhancement in connection with one count but not another, the defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the second count, and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial." (*Anderson, supra*, 9 Cal.5th at p. 956.) "Fair notice requires that every sentence

enhancement be pleaded in connection with every count as to which it is imposed." (*Id.* at pp. 956–957.)

In *People v. Garcia* (1999) 20 Cal.4th 490, 502 (*Garcia*) the Supreme Court concluded that "it is appropriate to allege [application of the Three Strikes law] only once as to all current counts." Alleging Three Strikes treatment *generally* as to all applicable counts, however, is not the same as alleging that the Three Strikes law applies to specific counts and then requiring the defendant to assume the allegation is universal.

Requiring a defendant to assume that a Three Strikes law enhancement is pleaded as to expressly omitted counts because a prosecutor has no discretion to *not* plead Three Strikes enhancements is tantamount to requiring a defendant assume Three Strikes treatment on counts to which the enhancement would apply even if there is *no* Three Strikes allegation in the pleading. That a prosecutor has a duty to do something does not render it done; people who have duties to do things sometimes fail to comply with those duties. In addition to violating a defendant's due process, deeming an enhancement alleged as to all counts when it is expressly not alleged as to certain counts may well enable sloppy pleading at best and devious practice at worst. The consequence for a prosecutor's failure to perform a duty should not be borne by the defendant.

In 1984, our Supreme Court identified a distinction between "two kinds of enhancements: (1) those which go to the nature of the offender; and (2) those which go to the nature of the offense." (*People v. Tassell* (1984) 36 Cal.3d 77, 90, overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 381, 401.) The court identified that distinction based on language that was then in Penal Code section 1170.1. (*Tassell*, at p. 91.) In 2004, the

2

Supreme Court clarified that this distinction does not apply to the Three Strikes law: "The Three Strikes law, unlike section 1170.1, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses, and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense." (*People v. Williams* (2004) 34 Cal.4th 397, 404–405; *People v. Sasser* (2015) 61 Cal.4th 1, 12.)

*Garcia* did not extend the distinction *Tassell* recognized or otherwise apply either of its section 1170.1-specific categories of enhancements to the Three Strikes law. *Garcia* identifies that the Three Strikes law "is a single comprehensive and indivisible sentencing scheme that either does or does not apply," and on that basis "it is appropriate to allege that status only once as to all current counts." (*Garcia*, *supra*, 20 Cal.4th at p. 502.) *Garcia* still acknowledges the reality that the *effect* of the Three Strikes law "*may* change from one count to another." (*Ibid.*)

*Garcia* and *Anderson* are not mutually exclusive. And *Tassell*'s offender-offense status distinction has no application here. Prosecutors may allege Three Strikes status as to all current counts in a single allegation. If they *choose* to specify counts to which the enhancement applies, however, they should be required to specify *all* counts for which the People allege application. I would therefore conclude that the trial court's decision to double Laanui's sentence as to count 6 constitutes an unauthorized sentence, and would reverse on that basis.

I concur with my colleagues' opinion in all other respects.


CHANEY, J.

3